

EXHIBIT

A

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**BILLY MORRISON,**

    Plaintiff,

**vs.**                           **CASE NO.: 4:18-cv-576**

**The FLORIDA DEPARTMENT OF
CORRECTIONS**, an agency of the state
of Florida,
**THE GEO GROUP, INC.**, a Florida
Corporation,
**CORRECT CARE SOLUTIONS, LLC**,
a Tennessee Limited Liability Company,
**GREGORY POYTHRESS**, in his
individual capacity, and
**JORGE LUIS ALVAREZ**, in his
individual capacity,

    Defendants.

_____/

## FIRST AMENDED COMPLAINT

The Plaintiff, Billy Morrison ("Morrison"), by and through his undersigned

counsel, hereby sues the Florida Department of Corrections ("FDC"), The Geo

Group, Inc. ("GEO"), Correct Care Solutions, LLC ("CCS"), Gregory Poythress

("Poythress"), and Jorge Luis Alvarez ("Alvarez"), and alleges as follows:

## INTRODUCTION

    1.    This is a civil rights action brought by Plaintiff Morrison seeking

monetary damages for the Defendants' violations of Plaintiff's rights secured by the

Civil Rights Act of and 1871, 42 U.S.C. § 1983, the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* The Defendants violated Plaintiff's rights by delaying and refusing to provide medical care and treatment to Plaintiff for his Hepatitis C, which constituted deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment, and discrimination on the basis of disability, in violation of the Americans with Disabilities Act and the Rehabilitation Act.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

3.      Jurisdiction and venue are proper in the Northern District of Florida (Tallahassee Division) in that the acts of misconduct occurred within the Northern District of Florida and as a result of Hurricane Michael destroying the Federal Courthouse in Panama City, rendering it closed indefinitely.

4.      The claims alleged herein are brought within the applicable statute of limitations.

5.      The Plaintiff has complied with all conditions precedent and exhausted all administrative remedies prior to filing this action. On multiple occasions, the

Plaintiff submitted formal grievances at the facilities he was detained. However, Plaintiff asserts that he never received a tracking number or a response until late 2017 for the grievance that ultimately led to his receiving treatment for HCV from Defendant FDC at the Reception and Medical Center ("RMC"), West Unit.

### THE PARTIES

### Billy Morrison

6.      Plaintiff Morrison brings this action for violations of the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. Plaintiff Morrison is an inmate incarcerated in the State of Florida and was an inmate at all times relevant hereto.

7.      Plaintiff tested positive for Hepatitis C Virus ("HCV") while incarcerated at Blackwater Correctional Institution ("Blackwater CI"). Plaintiff was originally diagnosed with HCV in 1993, however, his HCV remained dormant until approximately 2014. Defendants GEO, CCS, and FDC ordered, required, and/or conducted regular testing of Plaintiff to monitor his HCV while incarcerated, but denied him treatment for several years even though he was deemed eligible for treatment. In 2014, Plaintiff's HCV became more life threatening, rendering him as high risk and requiring treatment for his HCV. As a result of such testing, Plaintiff was transferred to Graceville Correctional Facility ("Graceville CF") in October of 2015 so that he could receive the treatment necessary to treat and cure his HCV.

However, it was not until late 2017 that Plaintiff received the treatment necessary to save his life.

## The GEO Group, Inc.

8.      Defendant GEO is a Florida-based company and private prison owner and operator. Defendant GEO operates private correctional facilities in Florida pursuant to contracts entered into with the State of Florida and Defendant FDC.

9.      Blackwater CI is a private correctional facility in Florida operated by Defendant GEO under contract with the State of Florida and Defendant FDC. GEO operated Blackwater CI at all times relevant to this Complaint.

10.     Graceville CF is a private correctional facility in Florida operated by Defendant GEO under contract with the State of Florida and FDC. GEO operated Graceville CF at all times relevant to this Complaint.

## Correct Care Solutions, LLC

11.     Defendant CCS is a health care company contracted with Defendant FDC and Defendant GEO to provide health care services to inmates at state and private correctional facilities in Florida. Defendant CCS provided medical services at Graceville CF at all times relevant to this Complaint.

## The Florida Department of Corrections

12.     Defendant FDC is an agency of the State of Florida receiving federal funds to operate its agency. Defendant FDC's is headquartered in Leon County,

Florida and therefore venue is proper in Tallahassee, Florida. Defendant FDC is responsible for overseeing the operations of its contractors, including Defendants GEO and CCS.

## Jorge Luis Alvarez

13.     Defendant Alvarez is a licensed medical doctor certified to practice in an Area of Critical Need who worked at Graceville CF at all times relevant hereto. Alvarez refused to treat Plaintiff's HCV despite being aware of Plaintiff's serious medical condition and disability.

14.     At all times relevant hereto, Defendant Alvarez acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendant Alvarez is sued in his individual capacity.

## Gregory Poythress

15.     Defendant Poythress is an Advanced Registered Nurse Practitioner ("ARNP") who worked at Graceville CF at all times relevant hereto.

16.     At all times relevant hereto, Defendant Poythress acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendant Poythress is sued in his individual capacity.

## FACTS

## Background Information on Hepatitis C

17.     Hepatitis C is a blood borne disease caused by the hepatitis C virus ("HCV"). The virus causes inflammation that damages liver cells, and is a leading cause of liver disease and liver transplants.

18.     HCV is transmitted by infected blood via several methods, including intravenous drug use and tattooing using shared equipment, blood transfusions with infected blood (typically before regular screening of donated blood began), and sexual activity. Intravenous drug use is the most common means of HCV transmission in the United States.

19.     HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. Chronic HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure. Fifty-five to eighty-five percent of infected people will develop chronic HCV.

20.     Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

21.     People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform the

job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to hepatocellular carcinoma (liver cancer).

22. When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Of those with chronic HCV, the majority will develop chronic liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe.

23. Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

24. Abdominal ascites can require paracentesis, a procedure wherein needle is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

25.     Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

26.     Cirrhosis that is accompanied by serious complications is known as decompensated cirrhosis. Cirrhosis without serious complications is called compensated cirrhosis.

27.     Thus, HCV is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. This physical impairment substantially limits one or more major life activity, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver.

28.     For all FDC and GEO inmates who have been diagnosed with HCV, there is a record of their impairment.

29.     Defendants FDC and GEO regard all inmates with HCV as having a physical impairment that substantially limits one or more major life activity.

8

30.     Chronic HCV is, as a matter of law, a serious medical need.

### General Prevalence of HCV

31.     Approximately 2.7 to 3.9 million Americans have chronic HCV.

32.     In 2000, the United States Surgeon General called HCV a "silent epidemic," and estimated that as much as two percent of the adult U.S. population had HCV.

33.     In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

34.     Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

35.     HCV is the leading indication for liver transplants in the United States.

### HCV in Prison

36.     The prevalence of HCV in prison is much higher than in the general population. It is estimated that between 16% and 41% of the United States jail and prison population has HCV. Thus, incarceration is a risk factor for HCV.

37.     Defendant FDC has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,000 inmates have HCV. As of August 8, 2016, Defendant FDC listed 4,797 inmates as having HCV in its internal records. As of late 2017, it was estimated that at least 7,000 inmates are infected with HCV.

38.    Because FDC does not conduct routine opt-out testing for HCV, upon information and belief, FDC is undercounting the number of inmates with HCV.

39.    In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 FDC inmates have HCV, including inmates committed to a GEO-operated facility. The true number is likely at the higher end of that spectrum because of the high prevalence of HCV in Florida: Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

## Standard of Care for HCV

40.    For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications, sometime required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

41.    In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications, called direct-acting antiviral ("DAA") drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic

HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

42.    These DAA drugs—currently Sovaldi (sofosbuvir), Olysio (simeprevir), Harvoni (sofosbuvir/ledipasvir), Viekira Pak (ombitasvir/paritaprevir/ritonavir/dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/paritaprevir/ritonavir), Zepatier (elbasvir/grazprevir), and Epclusa (sofosbuvir/velpatasvir)—have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

43.    Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

44.    For HCV, a "cure" is defined as a sustained virologic response ("SVR")—i.e., no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

45.    In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") formed a panel of experts to conduct an extensive,

evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org. The Centers for Disease Control and Prevention ("CDC") encourages health care professionals to follow the evidence-based standard of care developed by the IDSA/AASLD.

46.    The IDSA/AASLD guidelines set forth the medical standard of care for the treatment of HCV, which is now well-established in the medical community.

47.    The IDSA/AALSD panel, through the HCV Guidance, recommends immediate treatment with DAA drugs for all persons with chronic HCV. This is the standard of care for the treatment of HCV, and it reflects the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

48.    The Florida Department of Children and Families ("DCF"), the agency responsible for administering the Medicaid program in Florida, recently confirmed that, in determining what is medically necessary and therefore covered by the Medicaid program, DAA medications for HCV should be approved for all adult patients with an HCV diagnosis. DCF also specifically eliminated any requirement that there be any evidence of hepatic fibrosis before covering treatment. Thus, DCF

has recognized that the standard of care for HCV is to provide immediate treatment with DAA drugs to all patients with HCV, regardless of the stage of the disease.

49.    Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

50.    The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

51.    Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

## Screening, Diagnosis, and Monitoring of HCV

52.    Under the IDSA/AASLD guidelines, all persons with risk factors for HCV infection should be offered testing for HCV. This includes all persons born between 1945 and 1965 and all persons who were ever incarcerated.

53.    A person is generally diagnosed with HCV through a rapid blood test in which the blood is examined for HCV antibodies. A follow-up blood test determines whether the genetic material of HCV remains in the blood. A third blood test can determine which variation, or genotype, of HCV a person has.

54.     Although the standard of care is to treat all persons with chronic HCV with DAA drugs, it is still useful to determine the progression of fibrosis and/or cirrhosis in the liver to choose the appropriate DAA drug, to treat other conditions or complications a person may be experiencing, to screen for liver cancer, to advise patients about contraindications and drugs to avoid, and to determine whether liver transplantation is necessary.

55.     There are several methods used to determine the level of cirrhosis or fibrosis, along with an evaluation of the patient's symptoms. One such method is a liver biopsy, which is a surgery wherein a small sample of liver tissue is removed and histologically assessed. A typical biopsy evaluation method is a system called Metavir, which assigns a number corresponding to the amount of scar tissue on the liver, with 0 meaning no fibrosis and 4 meaning severe fibrosis or cirrhosis. A score of 2 or greater is considered significant fibrosis. Liver biopsies are generally regarded as the most accurate measure of fibrosis and cirrhosis, but they are not routinely recommended because they are invasive and potentially dangerous, and also because they are generally unnecessary, as the standard of care is to treat all HCV patients, regardless of disease progression.

56.     Other methods of assessing fibrosis and cirrhosis include blood tests, such as the APRI (AST to Platelet Ratio Index) score. This score is a ratio derived by comparing the level of an enzyme in the blood called aspartate aminotransferase

(AST) with the usual amount of AST in the blood of a healthy person and the number of platelets in the affected person's blood. Generally, an APRI score greater than 0.7 indicates significant fibrosis, and a score of 1.0 or greater indicates cirrhosis. But as explained below, a low APRI score does not necessarily indicate the absence of fibrosis.

57.     Another blood test is called the FIB-4, which is a ratio derived using the level of two enzymes in the blood, AST and alanine aminotransferase (ALT), as well as platelet count and the person's age.

58.     Standard ultrasounds or sonograms of the liver are unreliable indicators of the level of fibrosis, as advanced fibrosis may not be detected by these scans. But there is a more accurate version called FibroScan, which is a type of ultrasound known as transient elastography that uses sound waves to determine the amount of fibrosis present in the liver.

59.     In assessing the level of fibrosis or cirrhosis, the entire clinical picture must be taken into account. There is no one blood test, scan, or symptom that will accurately determine the extent of liver damage, and therefore relying solely on strict numerical cutoffs of any test result is inappropriate. Any abnormal test result or symptom should be taken as a sign of fibrosis or cirrhosis, but normal results in isolation cannot rule out fibrosis or cirrhosis.

60.     Relying solely on the APRI score to make treatment decisions is not adequate or appropriate because APRI has significant limitations. First, when an APRI score is extremely high, it has good diagnostic utility in predicting severe fibrosis or cirrhosis, but low and mid-range scores may miss many people who have significant fibrosis or cirrhosis. In fact, in more than 90% of HCV cases, an APRI score of at least 2.0 indicates that a person has cirrhosis, but more than half of people with cirrhosis will not have an APRI score of at least 2.0. Second, where a person has been diagnosed with cirrhosis or advanced fibrosis through some other means, a low APRI score does not negate the diagnosis—it should be presumed the patient has cirrhosis. Third, because AST levels fluctuate from day to day, a decreased or normalized level does not mean the condition has improved, and even a series of normal readings over time may fail to accurately show the level of fibrosis or cirrhosis.

61.     A health care provider must also evaluate a patient's symptoms and determine whether the liver disease is compensated or decompensated. Once liver disease has advanced, scoring of the clinical degree of liver dysfunction is done using the Childs-Pugh (C-P) score, also termed the Child-Turcotte-Pugh score (CPT). Variables include the serum albumin and bilirubin, ascites, encephalopathy, and prothrombin time (a measure of how well the blood clots). The score ranges from 5 to 15. Patients with a score of 5 or 6 have CPT class A cirrhosis (well-

16

compensated cirrhosis), those with a score of 7 to 9 have CPT class B cirrhosis (significant functional compromise), and those with a score of 10 to 15 have CPT class C cirrhosis (decompensated cirrhosis).

62.     Once cirrhosis has developed, patients should also be followed with twice yearly alfa fetoprotein (AFP) screens, which is a serum marker for the development of liver cancer. Increases in AFP indicate the possible presence of liver cancer.

63.     Individuals with comorbid HIV (or other immune disorders) and HCV are at a much greater risk for more rapidly progressive liver disease, and should be treated and closely followed.

## FDC's Unlawful Policy and Practice of Denying Treatment for HCV

64.     Despite the clear agreement in the medical community that all persons with chronic HCV should be treated with DAA drugs, FDC does not provide these lifesaving medications to FDC inmates with HCV. Instead, FDC has a policy, custom, and practice of not providing DAA medications to inmates with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of inmates with HCV.

65.     This policy, practice, and custom has caused, and continues to cause, the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

66.     Although FDC has a policy governing the treatment of inmates with HCV, which is outlined in Supplement #3 to Health Service Bulletin (HSB) 15.03.09 and was promulgated on June 27, 2016, in practice almost no inmates receive DAA medications. Instead, FDC simply enters the names of inmates with known HCV infection into a database and enrolls them in a gastrointestinal clinic—which means blood draws are taken every six to twelve months—but does not actually treat them.

67.     Although the HSB states that "all patients with chronic HCV infection may benefit from treatment," it does not require treatment for anyone. Rather, the HSB recommends treatment based on priority levels.

68.     In Priority Level 1 ("highest priority") are patients with decompensated cirrhosis measured as a 7-9 on the CTP scale, liver transplant candidates or recipients, patients with hepatocellular carcinoma and other serious comorbid medical conditions, and patients on immunosuppressant medication. In Priority Level 2 ("high priority") are patients with an APRI score greater than 2, advanced fibrosis shown on a liver biopsy, or other comorbid diseases and infections. In Priority Level 3 ("intermediate priority") are patients with Stage 2 fibrosis shown on a liver biopsy, an APRI score greater than 1.5, and patients with porphyria or diabetes. In Priority Level 4 ("routine") are patients with stage 1 fibrosis shown from a liver biopsy and all others with HCV infection. There is no further guidance in the policy regarding which priority levels receive treatment, or when. And again, despite

this written policy of prioritization, in practice FDC provides almost no treatment with medications.

69.     Liver biopsies are generally not performed for FDC inmates with HCV.

70.     Because the standard of care is to treat everyone, without regard to the stage of the disease, FDC's written policy (even if it was followed) of only providing treatment to patients with the most advanced stages of the disease amounts to deliberate indifference to serious medical needs, in violation of the Eighth Amendment. It is not consistent with the standard of care. Delaying treatment until a patient is extremely sick has the perverse effect of withholding treatment from the patients who could benefit the most from it, because the treatment is less effective for patients with the most advanced stages of the disease.

71.     But even if the policy were adequate, the FDC does not follow it because it provides treatment to almost none of the HCV-positive inmates in its custody. Indeed, despite the fact that FDC knows of at least 4,790 patients with chronic HCV, as of July 6, 2016, FDC has treated only five with DAA drugs. Upon information and belief, FDC also knows, based on national estimates and the fact that FDC does not routinely test for HCV, that it is very likely that at least 14,700, and as many as 40,184, FDC inmates have HCV.

72.     In fact, the FDC's treatment rate is among the lowest in the country for which there is reported data.

73.     And since 2013, the year the FDA approved DAA medications that cure HCV, at least 160 FDC inmates have died of chronic liver disease, cirrhosis, and other diseases of the digestive system. Since HCV is the most common cause of liver failure in the United States, it is likely that most of these deaths were due to chronic HCV. Upon information and belief, past and current practices of FDC are resulting in deaths that could have been prevented through treatment of HCV.

74.     Furthermore, assuming that prioritization were appropriate, FDC's policy is also inadequate because it relies on strict numerical cutoffs (and almost exclusively on the APRI score) rather than a holistic evaluation of the entire clinical picture to determine the level of fibrosis.

75.     And assuming that using numerical cutoffs were appropriate, FDC has set them so high that it precludes treatment for all but the most advanced cases of cirrhosis and fibrosis.

76.     Further, assuming that numerical cutoffs were appropriate and were set at appropriate levels, FDC is not even following them. Of the 4,790 patients identified by FDC as having chronic HCV, an analysis of their APRI scores and platelet counts indicates that almost 400 have probable cirrhosis, over 1,000 likely have advanced fibrosis, and over 1,700 likely have significant fibrosis. At the very least, all of these inmates should receive treatment. Yet, upon information and belief, less than twenty inmates have been treated.

77.     The FDC also unjustifiably delays providing HCV treatment, even though the standard of care requires treatment as early as possible. If DAA treatment is delayed until a patient has advanced fibrosis or cirrhosis (generally, the first two FDC priority levels), these medications can be significantly less effective. Moreover, if DAA treatment is delayed until a patient develops decompensated cirrhosis (generally, the first FDC priority level), a liver transplant preceded or followed by DAA treatment is the only way to cure the patient.

78.     In practice, the FDC delays treatment for virtually all patients with HCV, regardless of their disease progression, until the patient is released from prison or dies.

79.     Moreover, FDC's policy does not address liver transplantation, the only possible cure for people with decompensated cirrhosis. Even if given DAA treatment, many of these patients will likely die without liver transplants.

80.     The FDC's policy does not address the need for liver cancer screening, which is standard medical practice once individuals have progressed to advanced fibrosis or cirrhosis. Unless there is regular surveillance to find cancers early and remove them surgically, liver cancer has a very dismal prognosis. Contrary to the proper and necessary medical procedures and the community standard of care, Defendant has not been screening Plaintiffs, and, upon information and belief, other HCV-positive FDC inmates with advanced fibrosis and cirrhosis, for liver cancer.

81.    The HSB does not include routine opt-out testing for HCV (i.e., requiring the test unless the inmate affirmatively opts out). Thus, FDC does not know the full number of FDC inmates who have HCV, even though, upon information and belief, it knows the number to be much higher based on national estimates.

82.    Defendant FDC categorically withholds treatment from FDC inmates with HCV, but does not categorically withhold treatment from inmates with other similar diseases or conditions (such as HIV) or from other inmates without similar diseases or conditions.

83.    At all times relevant hereto, Defendant FDC enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. Defendant FDC has acted with deliberate indifference to the serious medical needs of FDC inmates with chronic HCV, including the serious medical needs of Plaintiff.

**GEO and CCS Have Adopted and Enforced FDC's Unlawful Policy and Practice of Denying Treatment for HCV**

84.    Defendant GEO operates the private prisons in Florida and does so under contract with Defendant FDC. Among others, Defendant GEO operates Graceville CI, which is one of the prison facilities where Plaintiff was housed and denied treatment for his HCV. When it comes to screening, evaluating, and treating

HCV-infected inmates at GEO facilities, Defendant GEO utilizes the same policy and practice as Defendant FDC. In other words, the FDC policy detailed above is, in effect, Defendant GEO's policy.

85.　　At all times relevant hereto, Defendant GEO enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. Defendant GEO has acted with deliberate indifference to the serious medical needs of inmates with chronic HCV, including the serious medical needs of Plaintiff.

86.　　Defendant CCS also utilizes the same policy and practice as Defendant FDC as it relates to screening, evaluating, and treating HCV-infected inmates at GEO facilities. Consequently, the FDC policy detailed above is, in effect, also Defendant CSS's policy.

87.　　Defendant CCS was the health care provider at Graceville CI during the time that Plaintiff was housed at that correctional facility. At all times relevant hereto, Defendant CCS enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. Defendant CCS has acted

with deliberate indifference to the serious medical needs of inmates with chronic HCV, including the serious medical needs of Plaintiff.

### Public Health Benefits of Treatment in Prison

88.     Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community. Curing the disease while people are in prison would prevent inmates from transmitting it when released, and testing would diagnose numerous individuals who were unaware they were infected, thus allowing them to seek treatment once released.

89.     Studies have shown that providing DAA treatment to everyone with chronic HCV increases long term cost-savings. One study even found that restricting DAA treatment access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAAs, over the course of treatment, the follow-up care outweighs the initial costs.

90.     Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population and also to reduce the costs associated with serious complications from untreated HCV, such as liver transplants and liver cancer.

### Delay and Denial of HCV Treatment to Plaintiff

91.     Plaintiff had chronic HCV. Despite knowing that Plaintiff had chronic HCV and test results that entitled him to receive treatment, Defendants have been deliberately indifferent to Plaintiff's serious medical needs by denying him DAA treatment, which was the standard of care and the required HCV treatment under the United States Constitution and the ADA and RA.

92.     Plaintiff's chronic HCV is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver.

93.     Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. Plaintiff was diagnosed at Blackwater CI, a GEO-operated facility, which was recorded in his medical records, along with some of his symptoms.

94.     Plaintiff is regarded by the Defendants as having an impairment that substantially limits one or more major life activity, as the Defendants perceive him

as having such an impairment, has diagnosed him with HCV, and records some of his symptoms in his medical records.

95.     Plaintiff meets the essential eligibility requirements for the receipt of services, or the participation in programs or activities, provided by FDC, including but not limited to medical services.

96.     Plaintiff requested treatment for HCV in 2014 after his blood revealed that his infection was active. This request for DAA treatment was a request for a reasonable accommodation in that DAAs were the only drug that could result in a cure for his disability. Plaintiff was denied treatment for his HCV and accommodations for his disability and condition. Such denial constituted a deliberate indifference because the denial of the HCV treatment was due, in part, to the cost of the medicine.

97.     Plaintiff's request for DAA treatment for his HCV was a reasonable request and a reasonable accommodation as the Defendants were constitutionally required to provide such medicine and treatment. DAAs were the necessary treatment under the prevailing standard of care for treating individuals with HCV. Failing to provide the DAAs resulted in Plaintiff's denial to meaningful access to prison programs, services, and activities. *See infra*. Providing the Plaintiff with no treatment or inadequate treatment prevented Plaintiff from accessing other services

within the prison, including the prison yard and participation in recreational activities at the prison.

98.    At all times relevant hereto, and at least as of 2015, Defendants had actual knowledge of Plaintiff's HCV and actual knowledge of his requests for treatment for HCV and accommodations for his disability.

99.    Defendants performed blood tests to "monitor" Plaintiff's HCV and, as of 2014, deemed Plaintiff eligible for DAA treatment based on the criteria outlined in FDC's HCV policy and practice. Nonetheless, Defendants failed to treat Plaintiff's HCV despite his repeated requests. Meanwhile, Plaintiff's condition worsened.

100.   In October of 2015, GEO staff transferred Plaintiff to an FDC facility where he was told he would receive treatment. However, FDC merely continued to monitor Plaintiff's condition without providing him treatment until late 2017.

101.   Despite receiving treatment in late 2017, Plaintiff still suffered injuries, including injuries to his liver. As a result of the Defendants' constitutional violations and violations of the ADA and RA, Plaintiff was also required to undergo several medical procedures where variceal bands were placed around his esophageal veins that were at risk of rupturing to prevent Plaintiff from bleeding out.

**COUNT I**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**(Against Defendants Poythress and Alvarez)**

102.   Plaintiff incorporates and re-alleges Paragraphs 1 through 101 as if fully set forth herein.

103.   This count is brought through 42 U.S.C. § 1983 and against Defendants Poythress and Alvarez for violations of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

104.   At all times relevant hereto, Defendants Poythress and Alvarez acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendants Poythress and Alvarez are sued in their individual capacities.

105.   Plaintiff had a serious medical need as he was diagnosed with chronic HCV. Defendants Poythress and Alvarez were subjectively aware that Plaintiff had chronic HCV and suffered from symptoms associated with chronic HCV. Plaintiff's condition and serious medical need was so obvious that even a layperson would easily recognize the necessity for medical attention and treatment.

106.   Between 2015 and 2017, Defendants Poythress and Alvarez refused to provide Plaintiff with DAA treatment, i.e., the treatment necessary to cure his HCV.

107.   Defendants Poythress and Alvarez, intentionally refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that their actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

108.   Defendants Poythress and Alvarez have caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

109.   Defendants Poythress and Alvarez's refusal to provide treatment worsened Plaintiff's serious medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendants Poythress and Alvarez knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would alleviate those risks and harms. Thus, Defendants Poythress and Alvarez have been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his chronic HCV.

110.   By denying Plaintiff the medically needed DAA treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendants Poythress and Alvarez imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

111.   Defendants Poythress and Alvarez's delay and denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

112.   Defendants Poythress and Alvarez's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

113.   Plaintiff did not receive the constitutionally-required DAA treatment because of the cost of the treatment.

114.   Plaintiff suffered damages as a direct and proximate result of Defendants Poythress and Alvarez's constitutional violation, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, the Plaintiff, Billy Morrison, demands judgment against Defendants Poythress and Alvarez for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## COUNT II
## 42 U.S.C. § 1983 – *MONELL* CLAIM
### (Against Defendants GEO and CCS)

115.   Plaintiff incorporates and re-alleges Paragraphs 1 through 101 as if fully set forth herein.

116.   This count is brought through 42 U.S.C. § 1983 and against Defendants GEO and CCS for violations of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

117.   At all times relevant hereto, Defendants GEO and CCS and their policymakers knew about and enforced policies, practices, and/or custom that

exhibited deliberated indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. Defendants GEO and CCS, acting through their employees and agents, intentionally delayed, failed, and refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that their actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

118. Defendants GEO and CCS have caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

119. The delay in treatment, or the refusal to provide treatment, by Defendants GEO and CCS, acting through their employees and agents, worsened Plaintiff's serious medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendants GEO and CCS knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would alleviate those risks and harms. Defendants GEO and CCS have been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his chronic HCV.

120. By denying Plaintiff the medically needed DAA treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendants GEO and CCS

imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

121. Defendants GEO and CCS's delay and denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

122. Defendants GEO and CCS's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

123. Plaintiff did not receive the constitutionally-required DAA treatment because of the cost of the treatment.

124. The constitutional violations of Defendants GEO and CCS, through the actions and omissions of its employees and agents, were directly and proximately caused by policies, practices, and/or customs implemented and enforced by Defendants GEO and CCS.

125. As a direct and proximate result of the policies, practices, customs, and deliberate indifference of Defendants GEO and CCS, Plaintiff has suffered damages, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, the Plaintiff, Billy Morrison, demands judgment against Defendants GEO and CCS for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## COUNT III
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA)
### (Against Defendant FDC)

126.   Plaintiff incorporates and re-alleges paragraphs 1 through 101 as if fully set forth herein.

127.   This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* and 42 U.S.C. §§ 12131–12134, and its implementing regulations.

128.   The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12131–12134; *see also* 28 C.F.R. §§ 35.130. In other words, the ADA impose an affirmative duty on public entities to create policies and procedures to prevent discrimination based on disability.

129.   Defendant FDC is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

130.   Plaintiff had chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b). This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting,

33

concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

131.   Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

132.   Plaintiff is regarded by FDC as having an impairment that substantially limits one or more major life activity, as FDC perceives them as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f). Defendant FDC has subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

133.   Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant FD, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

134.   By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC excluded Plaintiff from participation in, and denied him the benefits of, FDC services, programs, and activities (such as medical services) by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

135. By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC subjected Plaintiff to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

136. DAAs are the only effective medical treatment available for HCV under the prevailing standard of care, and is the constitutionally-required treatment under the Eighth Amendment. Plaintiff requested DAA treatment for his HCV, which was a request for a reasonable accommodation for his HCV. By denying or delaying in providing Plaintiff DAA treatment, Defendant FDC refused or failed to provide Plaintiff a reasonable accommodation for his request for treatment of his HCV in violation of Title II of the ADA.

137. Defendant FDC failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

138. Defendant FDC's refusal to provide Plaintiff with the DAAs also denied Plaintiff access to other prison services, programs, and activities that other inmates routinely access. For example, Plaintiff was unable to participate in recreation and other physical exercise. Further, in the event of a prison fight, because of his physical condition, Plaintiff would be unable to escape quickly. Plaintiff's inability to participate in recreational activities in the prison yard isolates Plaintiff and denies him meaningful access to these prison services, programs, and activities.

139.    Defendant FDC utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

140.    DAAs were readily available to Defendant FDC during this time period and yet it categorically refused to provide Plaintiff with treatment that the medical community deems essential.

141.    Defendant FDC denied and delayed providing Plaintiff with the necessary treatment and reasonable accommodation for his HCV because of the cost of the treatment and accommodation.

142.    Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff. Such violations include but are not limited to (a) FDC's refusal to provide Plaintiff with the only medical treatment available under the prevailing standard care, (b) FDC's refusal to provide Plaintiff with DAA treatment because the cost of such treatment was too expensive, and (c) to the extent it lacked sufficient funds to purchase and treat HCV-infected inmates like Plaintiff with DAAs, FDC's refusal or failure to even request adequate funding from the Florida Legislature.

143.    Had Defendant FDC not delayed but instead provided Plaintiff with DAA treatment and the reasonable accommodation he requested from 2015 through

2017, Plaintiff would not have suffered additional injuries, including both physical injuries and emotional pain and suffering.

144.   As a direct and proximate cause of Defendant FDC's actions and omissions, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights.

WHEREFORE, the Plaintiff, Billy Morrison, demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

**COUNT IV**
**SECTION 504 OF THE REHABILITATION ACT (RA)**
**(Against Defendant FDC)**

145.   Plaintiff incorporates and re-alleges paragraphs 1 through 101 as if fully set forth herein.

146.   This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 791–794, *et seq.*, and its implementing regulations.

147.   Section 504 of the RA prohibits discrimination against persons with disabilities by any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

148.   Defendant FDC is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

149.   Defendant FDC excluded Plaintiff—a qualified individual with a disability—from participation in, and denied him the benefits of, programs or activities solely by reason of his disability. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20); 28 C.F.R. § 42.503(a).

150.   Defendant FDC subjected Plaintiff—a qualified individual with a disability—to discrimination. 29 U.S.C. § 794(a).

151.   Defendant FDC denied Plaintiff—a qualified handicapped person—the opportunity accorded to others to participate in programs and activities. 28 C.F.R. § 42.503(b)(1).

152.   Defendant FDC utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of FDC's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

153.   Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

154.   As a direct and proximate cause of Defendant FDC's exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights.

WHEREFORE, the Plaintiff, Billy Morrison, demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts alleged above.

Respectfully submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ John M. Vernaglia*
RYAN J. ANDREWS (FBN 0104703)
ryan@andrewslaw.com
JOHN M. VERNAGLIA (FBN 1010637)
john@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic service on the following on 12th day of February, 2019 to:

Jeffery R**.** Lawley, Esq.
BILLING, COCHRAN, LYLES,
MAURO & RAMSEY, P.A.
SunTrust Center, 6th Floor
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
jrl@bclmr.com
*Attorneys for Defendant Correct Care*
*Solutions, LLC*

John S. Derr, Esq.
Christopher D. Hastings, Esq.
Quintairos, Prieto, Wood & Boyer, P. A.
227 North Bronough Street, Suite 7400
Tallahassee, Florida 32301
jderr.pleadings@qpwblaw.com
christopher.hastings@qpwblaw.com
linda.munroe@qpwblaw.com
*Attorneys for Defendant, FDOC*

Scott J. Seagle, Esq.
COPPINS MONROE, P.A.
1319 Thomaswood Drive,
Tallahassee, FL 32308
sjseagle@coppinsmonroe.com
bmiller@coppinsmonroe.com
*Attorneys for Geo Group, Inc.*

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA