## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

BILLY MORRISON,

     Plaintiff,

v.                                CASE NO.: 4:18-cv-576-RH-CAS

THE FLORIDA DEPARTMENT OF
CORRECTIONS et al.,

     Defendants.

_____/

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Billy Morrison, by and through the undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves for summary judgment against Defendant, the Florida Department of Corrections ("FDC"), and in support thereof, states as follows:

## I.
## INTRODUCTION

Plaintiff has sued FDC for violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") for FDC's unconstitutional delay in treating his chronic HCV while incarcerated. This Count has advised the parties that "[m]otions for summary judgment shall be filed as promptly as possible . . . ." ECF No. 21, at 4. Because Plaintiff believes that the current record sufficiently establishes

FDC's liability under the ADA and RA, and having no material facts that are in dispute, he moves for summary judgment at this time.

## II.
## STATEMENT OF UNDISPUTED FACTS

### A.   Material Facts Conceded By FDC in *Hoffer v. Jones*

### 1.   HCV Infection and the Progression of Liver Disease

HCV "is a viral infection, which is spread by exposure to blood or blood products." *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1294 (N.D. Fla. 2017) [1] (Order Granting Motion for Preliminary Injunction[2]). The most common way of contracting HCV is through intravenous drug use, but a person can also get infected through tattooing or blood transfusions. ECF No. 54-1, at 2. "The principle consequence of [HCV] infection is infection of the liver, which causes inflammation that in turn may result in scarring of the liver (fibrosis)." *Id.*

"**Liver scarring can significantly impair liver function and damage its crucial role in filtering toxins from the blood, as well as making proteins involved in liver clotting and fighting infections**." *Id.* (emphasis added). Moreover, liver scarring places patients "at risk of liver failure or liver cancer." *Id.*

---

[1] *Hoffer v. Jones* is hereinafter referenced to as ECF No. 54-1.
[2] In its order on summary judgment, the Court "expressly incorporate[d] all findings from its prior order granting Plaintiffs' motion for preliminary injunction." *Hoffer v. Inch*, No. 4:17-cv-214-MW/CAS, 2019 U.S. Dist. LEXIS 66140, at *5-6 (N.D. Fla. Apr. 18, 2019) (hereinafter referenced to as ECF No. 54-2). Further, the Court noted that FDC "no longer wishes to contest" the issues that the Court "already resolved in favor of the Plaintiffs." ECF No. 54-2, at 3.

Liver failure carries with it a host of serious symptoms, including bleeding from any site (e.g., esophageal varices), fluid accumulation in the legs or abdomen (ascites), life-threatening infections, and eventual failure of other organs such as the kidneys. *Id.* Liver failure is essentially untreatable, and "has a very dismal prognosis." *Id.*

The amount of liver scarring a patient has is usually measured on the METAVIR scale. *Id.* On this scale, a person can be classified F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis). *Id*. The rate at which patients progress along this scale differs among the population. *Id.* However, about 20–50% of people infected with HCV spontaneously clear the virus within six months of infection. *Id*. at 3. The remaining 50–80% who do not clear the virus within six months are referred to as having chronic HCV. *Id.*

Among those with chronic HCV, about 30% of patients maintain a stable chronic infection, 40% suffer from slow fibrosis progression, and 30% suffer from rapid fibrosis progression. *Id.*; *see also* ECF No. 54-3, at 54-55 (testimony of Dr. Dewsnup[3]). Patients with a stable chronic infection usually only reach F1 (mild fibrosis) as long as they maintain other healthy habits such as abstaining from alcohol. ECF No 52-1, at 3; *see also* ECF No. 54-3, at 55-62. Patients with a slow fibrosis progression may take upwards of 20 years to reach F4 (cirrhosis). ECF No.

---

[3] Dr. Daniel Dewsnup was FDC's expert in *Hoffer*. *See* ECF No. 54-1, at 8. His testimony was heavily relied on by the *Hoffer* Court. *See id.* at 8-13.

54-1, at 3; *see also* ECF No. 54-3, at 62-65. Finally, patients with a rapid fibrosis progression may reach cirrhosis within as short a timeframe as one year. ECF No. 54-1, at 3; *see also* ECF No. 54-3, at 65-67.

The extent of liver scarring a patient has does not necessarily correlate with the symptoms they are suffering. ECF No. 54-1, at 3. For instance, "[s]omebody can be completely asymptomatic and present with cirrhosis." *Id.* Nor do "symptoms have anything to do with what the risk is of liver failure." *Id.*

Once a person reaches F4 (cirrhosis), they are further classified based on whether they are suffering from HCV-related symptoms/complications. *Id*. A patient with cirrhosis and no related complications is referred to as having compensated cirrhosis. *Id.* A patient with cirrhosis that is accompanied with complications is referred to as having decompensated cirrhosis. *Id.* The distinction between these two groups is important because their survival rates are markedly different. *Id.* Whereas the five-year survival rate for someone with compensated cirrhosis is 91%, the five-year survival rate for someone with decompensated cirrhosis is only 50%. *Id.* at 3-4. Once a person has decompensated cirrhosis "their liver has truly failed." *Id.* at 4. At that point, "the only true curative treatment is a liver transplant." *Id.*

### 2.   Treatment of HCV Infection

Historically, cHCV has been "difficult to treat." *Id.* One old method of treatment involved the drugs Interferon and Ribavirin. *Id.* That treatment required

weekly injections and could take as long as twelve months to complete. *Id.* The side effects were "terrible." *Id.* Taking the treatment was akin to "having the flu for a year." *Id.* "People's hair fell out, they had rashes, they had chest pain, they felt suicidal, [and] some committed suicide." *Id.* Despite the terrible side effects, doctors still prescribed the treatment when patients had a high level of liver scarring because "the likelihood of getting to cure, which was still only about 30 percent, was better than those terrible side effects." *Id.*

But in late 2013 a new class of drugs known as direct-acting antivirals ("DAAs") were released to market. *Id.* These DAAs proved to be "a revolution in medicine." *Id.* Treatment with DAAs consists of taking a pill once or twice a day. *Id.* The treatment period with DAAs is only about twelve-weeks long. *Id.* Moreover, DAAs have "very few" side effects. *Id.* Most importantly, about 95% of patients who take DAAs are cured of HCV. *Id.*

Unfortunately, this revolution in medicine came with a price. DAAs "are very expensive." *Id.* In September of 2016, a single course of treatment with DAAs cost approximately $50,000 to $75,000. *Id.*; *see also* ECF No. 54-4, at 34 (testimony of Tom Reimers[4]). Even though prices have been going down as new DAAs are

---

[4] From January 2013 to September 2016, Tom Reimers was FDC's Director of Health Services Administration, and then became Director of Health Services. ECF No. 54-4, at 4-5. He is FDC's top health care official.

released, a single course of treatment may still cost as much as $37,000 or more. ECF No. 54-1, at 4; *see also* ECF No. 54-4, at 45.

Despite the high cost of DAAs, the standard of care is to treat chronic HCV patients with DAAs as long as there are no contraindications or exceptional circumstances. *See* ECF No. 54-1, at 4. This has been the prevailing standard of care since late-2013 when DAAs were released to market. *See* ECF No. 54-5, at 5-9 (Plaintiff's Expert Report of Don C. Rockey, M.D.); *see also* ECF No. 54-6 (FDC's draft legislative budget request for the 2016-17 fiscal year). It is inappropriate to only treat those with advanced levels of fibrosis. ECF No. 54-1, at 4; *see also* ECF No. 54-3, at 55-58. The HCV Guidance—a resource developed by the American Association for the Study of Liver Diseases (AALSD) and the Infectious Diseases Society of America (IDSA)—recommends giving DAAs to any patient with chronic HCV (absent certain contraindications).; ECF No. 54-7 (current HCV Guidance dated May 24, 2018); *see also* ECF No. 54-8 (HCV Guidance dated April 12, 2017); ECF No. 54-9 (HCV Guidance dated October 8, 2014); ECF No. 54-1, at 4.

**B.  FDC's History of Failing to Treat Inmates with HCV**

FDC uses private contractors to provide medical services to inmates. ECF No. 54-1, at 5; *see also* ECF No. 54-4, at 5. In 2013, those contractors were Corizon and Wexford. ECF No. 54-1, at 5; *see also* ECF No. 54-4, at 5. Under FDC's contracts with Corizon and Wexford, there were two ways that doctors could obtain drugs.

ECF No. 54-1, at 5; *see also* ECF No. 54-4, at 5. Most drugs were listed on an FDC-approved list, referred to as the formulary. ECF No. 54-1, at 5; *see also* ECF No. 54-4, at 6. Those drugs were readily available to doctors and were paid for directly by FDC. ECF No. 54-1, at 5; *see also* ECF No. 54-4, at 6. Drugs not listed on the formulary had to be specially requested. ECF No. 54-1, at 5; *see also* ECF No. 54-10, at 25-26 (testimony of Dr. Maier[5]). Specially requested drugs were paid for by Corizon or Wexford. ECF No. 54-1, at 5; *see also* ECF No. 54-10, at 25-26.

When DAAs came out in late 2013, they were not included on the formulary. ECF No. 54-1, at 5; *see also* ECF No. 54-4, at 6-7. DAAs were found to be too expensive by FDC's top officials, despite their proven effectiveness in curing HCV. *See* ECF No. 54-11[6]; ECF No. 54-6 ("The newer medications are more efficacious, regardless of the genotype and stage of the disease, and have fewer side effects"). Even after becoming aware in June of 2014 that the Federal Bureau of Prisons was using DAAs to treat HCV, ECF No. 54-15, FDC refused to include them on its formulary and failed to update its HCV-treatment policy until June 2016 to reflect

---

[5] Dr. Albert Carl Maier consults on litigation and grievances relating to medicine in FDC's Central Office. He was previously employed by Corizon as the Medical Director at Reception and Medical Center from June 2014 to February 2015. *See* ECF No. 54-10, at 5-8, 33.
[6] ECF No. 54-11 is an email Dr. Olugbenga Ogunsanwo received on December 9, 2013, announcing the approval of Sovaldi, a DAA drug, which he forwarded to Tom Reimers, Dr. Long Do, and Stephen Whitfield saying "[h]ere we go again with these expensive Hep C meds!!". Dr. Ogunsanwo was Assistant Secretary for Health Services from 2011 to 2016. ECF No. 54-12, at 13-14. Dr. Do was Director of Medical Services from 2013 to December 2015. ECF No. 54-13, at 15. Stephen Whitfield has been FDC's Pharmaceutical Services Director since 2010. ECF No. 54-14, at 15-16.

that prescribing DAAs was the new standard of care at that time. *See* ECF No. 54-16 (FDC's policy revised June 27, 2016); *cf.* ECF No. 54-17 (FDC's policy revised January 2015); ECF No. 54-18 (FDC's policy dated September 2014); ECF No. 54-19 (FDC's policy revised April 2017).

Nevertheless, Dr. Scott Kennedy[7] decided to assemble twelve inmates (the "Kennedy 12") with the goal of treating them with DAAs. ECF No. 54-1, at 5; *see also* ECF No. 54-10, at 18-22. By the end of 2014, the Kennedy 12 had been assembled and thoroughly evaluated. ECF No. 54-1, at 5; *see also* ECF No. 54-10, at 20-22. But the Kennedy 12 were never given any DAAs because the necessary funds were not available. ECF No. 54-1, at 5; *see also* ECF No. 54-10, at 22-23. This was so despite the fact that all twelve inmates showed signs of advanced liver damage. ECF No. 54-1, at 5; *see also* ECF No. 54-10, at 23-24.

FDC kept track of how many inmates had HCV. In early 2015, FDC reported that 5,272 inmates were currently infected with HCV. ECF No. 54-21, at 2, 7. However, only five inmates were receiving any kind of HCV treatment. *Id.* at 7. This was clearly not concerning to FDC's top officials as only eight inmates were treated over the next two years. ECF No. 54-1, at 6. Indeed, there was no future plan for expanding HCV treatment. ECF No. 54-21, at 8. FDC was more concerned with

---

[7] Dr. Scott Kennedy was the southeast medical director for Corizon at that time. *See* ECF No. 54-20, at 94 (testimony of Dr. Timothy Whalen).

saving money than treating HCV-infected inmates. Stated differently, FDC knew that it had to treat HCV-infected inmates, but was indifferent to providing the treatment because it was too expensive.

As the years went on, FDC officials recognized that inmates were dying from HCV because they were not being treated. ECF No. 54-1, at 5; *see also* ECF No. 54-10, at 54-55 (discussing conversations with Dr. Do). Similarly, Tom Reimers, the FDC administrator responsible for overseeing the contractors, recognized that inmates with HCV were not being treated and found the lack of treatment to be unacceptable. ECF No. 54-1, at 5; *see also* ECF No. 54-4, at 10, 40-43. Again, the reason why inmates were not being treated was because of a lack of funding. ECF No. 54-1, at 5; *see also* ECF No. 54-4, at 40.

By mid-2016, FDC had updated its HCV-treatment policy to acknowledge that prescribing DAAs was the standard of care. ECF No. 54-1, at 6; *see also* ECF No. 54-16, at 6-7. But again, the funding was not available to treat anyone. ECF No. 54-1, at 6. In 2015, Reimers prepared a legislative budget request of $6.5 million to obtain DAAs for the 2016–17 fiscal year, but the request never made it out of FDC (i.e., someone in FDC denied it). ECF No. 54-1, at 6; *see also* ECF No. 54-4, at 44-45. The budget request stated that "[i]nmates with Hep C are at very high risk for developing Cirrhosis and Liver Cancer if left untreated, and they can also spread the Hep C virus to others." ECF No. 54-6. The request warned that a "[f]ailure to treat

the eligible inmates puts the Department at risk of litigation, including class action suits." *Id.* In other words, FDC knew that the failure to provide DAAs violated federal laws and the U.S. Constitution. Further, the funding was requested to achieve a single goal: to "[p]rovide for care, custody and management of inmates while ensuring public and staff safety." *Id.* Nevertheless, FDC decided not to request the funds. ECF No. 54-1, at 6. In 2016, Reimers prepared a $29 million request for the 2017–18 fiscal year, ECF No. 54-22, but that too never made it out of FDC. ECF No. 54-1, at 6; *see also* ECF No. 54-4, at 46-47.

Eventually, Corizon and Wexford's contracts with FDC ended, and FDC began a new contract with Centurion. ECF No. 54-1, at 6; *see also* ECF No. 54-4, at 7. But the change in contractor did not come with a change in behavior; inmates with HCV were still not being treated. ECF No. 54-1, at 6. Indeed, as of November 17, 2017, only thirteen inmates had been treated with DAAs. ECF No. 54-1, at 6; *see also* ECF No. 54-4, at 47-48.

## C. Undisputed Facts Concerning Plaintiff Morrison

Plaintiff is 53 years old and a former FDC inmate. *See* ECF No. 54-23. He was incarcerated from November 13, 2013, to June 5, 2019. *Id.* During his initial intake screening, Plaintiff informed FDC medical staff that he has had HCV since he was 18 years old. ECF No. 54-24, at 18; *see also* ECF No. 54-33, at ¶ 8 (FDC's Answers to Plaintiff's First Requests for Admissions). In other words, Plaintiff had

HCV for over 20 years prior to being re-diagnosed with HCV in November 2013. ECF No. 54-5, at 5. As a result, Plaintiff was referred to the gastrointestinal clinic— a chronic illness clinic—for his HCV in December 2013. ECF No. 54-24, at 68.

Plaintiff was an F4 and has compensated cirrhosis. ECF No. 54-25, at 7-10, 53, 58-60, 63. From the time he entered prison, Plaintiff had ongoing inflammation in the liver and developed scarring that eventually led to cirrhosis, which he likely had as early as 2013. ECF No. 54-5, at 5, 8. It is frequently noted in his medical records that Plaintiff's platelets were low and were decreasing over time. *Id.* at 5; *see also* ECF No. 54-24, at 74, 79, 86, 91, 95, 97, 99, 101, 122, 125, 146, 149, 151, 160, 175, 178, 186, 188, 193, 198; ECF No. 54-25, at 53, 58, 60, 67, 80, 89, 124, 131, 154, 165, 194, 214, 222, 224. Low platelet count is a complication of HCV and is a sign of worsening portal hypertension, consistent with the progression of Plaintiff's liver disease. ECF No. 54-5, at 8. Plaintiff eventually developed portal hypertension and esophageal varices—complications of chronic HCV and cirrhosis. *See* ECF No. 54-5, at 7; ECF No. 54-25, at 48, 53, 58, 60, 63, 75, 77, 94, 103-08, 123, 129, 134, 138, 145, 156-58, 162-66, 177-80, 186, 194-95, 197, 402-03, 218, 224.

   **1. FDC Knew in 2015 that it was required to treat Plaintiff's chronic HCV, but failed to do so for 2.5 years.**

Plaintiff's medical records indicate that he consented to HCV treatment on September 22, 2015, and that treatment was "clinically indicated." ECF No. 54-24,

at 101. On September 29, 2015, Sara Williams, the Health Services Administrator at Blackwater River Correctional Facility ("Blackwater"), sent an email to Donna Graham, an administrator within FDC's Office of Health Services, listing the Plaintiff as one of four inmates who had an elevated APRI score and who "required treatment for Hepatitis C." ECF No. 54-26.

On October 15, 2015, FDC facilitated Plaintiff's transfer to Graceville Correctional Facility ("Graceville") to begin DAA treatment. *See* ECF No. 54-26; *see also* ECF No. 54-24, at 106-07. At least that is what Plaintiff was told. ECF No. 54-27, at 2 (Sworn Statement of Billy Morrison). However, Plaintiff never received DAAs at Graceville. *See* ECF No. 54-28 (email regarding Plaintiff's transfer to Okaloosa CI for HCV treatment). It was not until March 29, 2018, that Plaintiff finally received DAAs, after the *Hoffer* Court ordered FDC to begin treating inmates with chronic HCV. *See* ECF No. 54-25, at 94-98; *see also* ECF No. 54-5, at 7. Plaintiff was transferred out of Graceville[8] because the treatment had to be administered at a FDC-run facility. *See* ECF No. 54-28 (email from Dr. Whalen[9] to

---

[8] Graceville and Blackwater are privately-operated facilities by The GEO Group, Inc. ("GEO"). GEO-operated facilities are required to "strictly" adhere to FDC's drug formulary and follow FDC policy, procedure, and health services bulletins, including FDC's HCV-treatment policy. *See* ECF No. 54-29, 27-28, 61-62 (Blackwater operations contract); ECF No 52-30, at 26, 35 (Graceville operations contract).

[9] Dr. Whalen was the Region 2 Medical Director for Corizon from June 2014 to January 2016, when he was hired by FDC as Director of Medical Services, and eventually became Chief Clinical Advisor. ECF No. 54-20, at 87-99 (testimony of Dr. Whalen).

Donna Graham saying "[h]ere is another HCV treatment patient that needs to be sent to a Centurion CI.").

Plaintiff requested treatment on February 4, 2016, ECF No. 54-24, at 124, and again on August 16, 2016. *Id.* at 143. He was merely told that he "will be treated when the time comes." *Id*. The time for Plaintiff to be treated was years before. ECF No. 54-5, at 5. By October 18, 2016, Plaintiff's labs result indicated that he had portal hypertension and cirrhosis. *Id.* at 5-6; ECF No. 54-24, at 149.

By April of 2017, Plaintiff's platelets were dangerously low and rapidly decreasing. *See supra*. Plaintiff continued to request treatment but to no avail. *See* ECF No. 54-24, at 174, 184. On July 30, 2017, Plaintiff filed a formal grievance, complaining about his HCV-related symptoms and requesting treatment. ECF No. 54-31. His grievance was denied. *Id.* On August 24, 2017, Plaintiff timely appealed to the Secretary's Office, again complaining of his HCV-related symptoms and requesting treatment. *See* ECF No. 54-32. Although it was approved, Plaintiff did not receive a response to his appeal until December 1, 2017—more than three months later. *See id.* This approval came directly from Dr. Whalen, FDC's Chief Clinical Advisor. *See* ECF No. 54-28.

Plaintiff's Fibrosure results showed that he had F4 cirrhosis. ECF No. 54-25, at 7-10. This was no surprise in light of Plaintiff's medical records dating back to 2013. *See* ECF No. 54-5, at 6-7. Indeed, Plaintiff was likely cirrhotic well before

December 8, 2017, and should have received DAAs as early as 2013, when FDC recognized that he had HCV. *See id.* at 5-9. Had he been treated then, at the time that there was evidence of advanced fibrosis and cirrhosis, Plaintiff may not have developed portal hypertension or esophageal varices. *Id.* at 7; *see also* ECF No. 54-25, at 145, 194 (charting ascites). Plaintiff has had to undergo multiple invasive and painful procedures for esophageal varices. *See* ECF No. 54-5, at 7; ECF No. 54-25, at 103-08, 162-66.

### III.
### MEMORANDUM OF LAW

**A.   Summary Judgment Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.   Standard Under the ADA and RA**

To state a claim under Title II of the ADA, Plaintiff must show (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the Plaintiff's disability. *Bircoll v. Miami–Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007); *Shotz*

*v. Cates*, 256 F.3d 1077, 1079 (11th Cit. 2001) (citing 42 U.S.C. § 12132); *see also* 28 U.S.C. § 794(a) (similar standard under RA). "With the exception of its federal funding requirement, the RA uses the same standards as the ADA." *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005); *see also Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) ("Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases . . . ."). FDC is indisputably a public entity that receives federal financial assistance.[10] *See* 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104.

### 1.   Plaintiff is a Qualified Individual with a Disability

Under the ADA, a "qualified individual with a disability" is:

> [A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff only needs to satisfy one of those

---

[10] While FDC has not yet filed an Answer in this case, there can be no reasonable dispute as to this material fact. *See, e.g.*, Order Denying the Department's Summary-Judgment Motion at 3, ECF No. 230, *Cimillo v. Austin et al.*, Case No. 4:16cv584-RH/CAS (N.D. Fla. Aug. 10, 2018).

definitions. *Gordon v. E.L. Hamm & Assocs.*, 100 F.3d 907, 911 (11th Cir. 1996);

28 U.S.C. § 35.108(a)(2)(ii). Moreover, the applicable regulations instruct that "[t]he

definition of 'disability' shall be construed broadly in favor of expansive coverage,

to the maximum extent permitted by the terms of the ADA. 28 U.S.C. §

35.108(a)(2)(i)..[11]

A physical impairment means "[a]ny physiological disorder or condition,

cosmetic disfigurement, or anatomical loss affecting one or more body systems, such

as: . . . digestive, . . . immune, circulatory, hemic, lymphatic, skin, and endocrine."

28 U.S.C. § 35.108(b)(i).

Major life activities include, but are not limited to:

> (ii) The operation of a major bodily function, such as the
> functions of the immune system, . . . and digestive, . . .
> circulatory, . . . endocrine, hemic, [and] lymphatic . . .
> systems. **The operation of a major bodily function
> includes the operation of an individual organ within a
> body system**.

28 U.S.C. § 35.108(c)(1) (emphasis added).

The term "substantially limits" must be "construed broadly in favor of

expansive coverage, to the maximum extent permitted by the terms of the ADA." 28

U.S.C. § 35.108(d)(i). An impairment only needs to substantially limit one major

---

[11] "Because Congress explicitly authorized the Attorney General to promulgate regulations under
the ADA, *see* 42 U.S.C. § 12134(a), the regulations 'must [be given] legislative and hence
controlling weight . . . .'" *Shotz*, 256 F.3d at 1079 n.2.

life activity to be considered a disability. *See* 28 U.S.C. § 35.108(d)(iii). Indeed, "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 28 U.S.C. § 35.108(d)(ii).

### i.   *Plaintiff Had an "Actual Disability"—Chronic HCV*

First, it is clear Plaintiff had chronic HCV. In fact, he had HCV for almost 30 years prior to his incarceration, and was not cleared of HCV until after completing treatment in 2018.

It is also clear that HCV causes a physical impairment. The principal consequence of HCV is infection of the liver, which causes inflammation that in turn causes liver scarring. The liver performs a crucial role in filtering toxins from the blood (a digestive function), making proteins involved in liver clotting (a circulatory and hemic function), and fighting infections (an immune function). *See* ECF No. 54-1, at 2. Liver scarring can significantly impair liver function, which puts patients at risk of liver failure or cancer. *Id.* The risk is increased in persons with cirrhosis, such as the Plaintiff. *See* ECF No. 54-3, at 62-66.

Moreover, Plaintiff's expert, Dr. Don C. Rockey, provided in his expert report that Plaintiff had a disability because chronic HCV caused a physical impairment of Plaintiff and substantially limited a major bodily function of Plaintiff—the proper function of his liver. ECF No. 54-5, at 7. This cannot be reasonably disputed by FDC in light of its prior admissions in other cases and the facts presented to this Court.

Plaintiff's platelet count was low and was decreasing over time, which was a sign of worsening portal hypertension and consistent with the progression of Plaintiff's liver disease. *Id.* at 5. Labs tests performed in October of 2016 confirmed low platelets, consistent with portal hypertension and cirrhosis. *Id.* at 6. The development of cirrhosis is the single most important risk factor for developing hepatocellular carcinoma (liver cancer). *See generally* ECF No. 54-3.

Plaintiff likely developed cirrhosis as early as 2013, more than four years before FDC was judicially ordered to treat Plaintiff with DAAs. Even if Plaintiff was not presenting symptoms of *cirrhosis*, his livers ability to function properly was clearly substantially limited compared to most people in the general population as a result of HCV. Ultimately, however, Plaintiff did develop symptoms of cirrhosis—esophageal varices and ascites—which are complications of liver failure. Had FDC not delayed treating Plaintiff, he may not have developed such painful conditions. They were caused by HCV, a disability, which FDC cannot reasonably dispute.

### ii.   *Plaintiff Has a "Record of Such an Impairment"*

Plaintiff also had a "record of such an impairment" and FDC knew about it. In 2013, Plaintiff told FDC medical staff that he had HCV. *See* ECF No. 54-33, at ¶ 8. More importantly, he informed medical staff that he was diagnosed with HCV in 1984, which was noted numerous times in his medical records. Even with slow fibrosis progression, about 20% of patients will develop cirrhosis over a 20-year

interval. Plaintiff had HCV for almost 30 years before his sentence began. This fact should have alerted FDC medical staff on intake that Plaintiff had advanced liver disease, and likely cirrhosis.

In November 2013, Plaintiff was re-diagnosed with HCV and referred to the chronic illness clinic, which suggests that FDC knew Plaintiff's HCV was serious. It is frequently noted in Plaintiff's medical record that his platelets were low and were decreasing over time, which is a sign of cirrhosis. More importantly, on September 22, 2015, it is noted in the medical record that treatment for HCV was "clinically indicated" and that Plaintiff consented to treatment. ECF No. 54-24, at 101. Rather than receive treatment, however, Plaintiff was merely scheduled for a follow-up appointment in 180 days, "per DOC policy." *Id.* at 101. Plaintiff's medical record is replete with laboratory data consistent with progressive liver disease and cirrhosis. As Dr. Rockey stated, "the symptoms of chronic HCV had been charted in [Plaintiff's] medical records" for years. ECF No. 54-5, at 7. Thus, there was a record of Plaintiff's impairment and disability.

### iii.   Plaintiff Was "Regarded as Having Such an Impairment"

For similar reasons, Plaintiff was also "regarded as having such an impairment." That is, Plaintiff was subjected to prohibited action (the denial of DAAs) because of an actual physical impairment (chronic HCV). FDC cannot reasonably dispute the seriousness of cirrhosis and its effect on liver function. Once

a person reaches cirrhosis, they are at increased risk of developing liver cancer and other complications (such as esophageal varices and ascites). Indeed, FDC has conceded in prior litigation that "symptoms [do not] have anything to do with what the risk is of liver failure." ECF No. 54-1, at 3; ECF No. 54-2, at 3. There were signs that Plaintiff had cirrhosis as early as 2013, and certainly in 2015, warranting immediate treatment with DAAs. FDC did nothing. And because of it, Plaintiff in fact developed esophageal varices and ascites.

More importantly, FDC knew Plaintiff's HCV was very serious and that he needed treatment. In an email sent to Donna Graham[12] on September 29, 2015, Sara Williams, the Health Services Administrator at Blackwater, listed Plaintiff as one of four inmates that "require treatment for Hepatitis C." ECF No. 54-26. Ms. Williams noted Plaintiff's elevated APRI score and suggested he be transferred to another facility for treatment. Ms. Graham apparently agreed because Plaintiff was later transferred to Graceville "due to [his] medical needs." *Id.* What Plaintiff needed was DAAs, and FDC knew it in 2015, the same year Reimers prepared the draft legislative budget request for the 2016-2017 fiscal year.

In that budget request, FDC stated that "The Department has no funding to provide treatment to inmates with Hepatitis C who meet the current national

---

[12] Ms. Graham coordinates inmate medical transfers at the direction of Timothy Whalen, MD, FDC's Chief Clinical Advisor and one of its top officials. See ECF No. 54-26; ECF No. 54-28.

treatment criteria." ECF No. 54-6. In other words, FDC knew that it had an obligation to comply with the national treatment criteria for HCV, and admitted that it was not meeting such criteria because it lacked the necessary funding. FDC also stated that "[i]nmates with Hep C are at very high risk for developing Cirrhosis and Liver Cancer if left untreated." *Id.* It follows that FDC knew that it should have been treating HCV-infected inmates *prior* to them developing F4 cirrhosis, and that the failure to do so put those inmates, including Plaintiff, at a very high risk of developing cirrhosis or liver cancer. Nonetheless, FDC decided not to ask the Legislature for funding, and Plaintiff remained untreated and cirrhotic.

It is no surprise, therefore, that FDC did not provide DAAs to Plaintiff in 2015, despite knowing that he met the national treatment criteria and should have been treated before developing cirrhosis. Unfortunately, Plaintiff did develop cirrhosis and is now at increased risk of liver cancer and liver failure. FDC's knowing failure to request funding and comply with the national treatment criteria was indisputably the cause. Accordingly, Plaintiff was also "regarded as" having a physical impairment.

### iv.   *Plaintiff was a "Qualified Individual"*

Simply by virtue of incarceration, Plaintiff met the essential eligibility requirements for the receipt of medical services. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("The federal courts have consistently ruled

that governments, state and local, have an obligation to provide medical care to incarcerated individuals. This duty is not absolved by contracting with an entity . . . ." (citation omitted)). Upon intake, Plaintiff was given an initial health screening and advised that medical services were available to him while in prison. ECF No. 54-24, at 18, 33. Indeed, because of his diagnosed with HCV, Plaintiff was enrolled in the chronic illness clinic. *See id.* at 57-58, 68-69; ECF No. 54-5, at 5. Therefore, there can no reasonable dispute that Plaintiff was a qualified individual.

## 2. FDC Denied Plaintiff the Benefit of Medical Services By Reason of His Chronic HCV and Disability

The ADA prohibits public entities from excluding individuals from participation in, or denying them the benefits of, a public entity's services, programs, or activities, or discriminating against them because of a disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

Federal courts have found that an inmate who was denied prison medical services by reason of disability, such as HCV, can state a claim for damages under Title II of the ADA. *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates . . . ."); *Bircoll*, 480 F.3d at 1081 ("[A] disabled prisoner can state a Title II-ADA claim if he is denied participation in an activity provided in state prison by reason of his disability."); *Kiman v. New Hampshire Dep't of Corrs.*, 451 F.3d 274, 286-87 (1st Cir. 2006) ("Access to prescription medications is part of a prison's

medical services and thus is one of the services, programs, or activities covered by the ADA."); *Yeskey*, 524 U.S. at 210 (noting that prison "medical services" are within the scope of Title II). Moreover, FDC has conceded that HCV can cause a disability and that an inmate with chronic HCV can state a Title II ADA claim for medical services. *See* ECF No. 54-2, at 5 ("Defendant [FDC] does not dispute that a prison inmate can state a Title II ADA claim for medical services.").

The Plaintiff, a former FDC-inmate with a longstanding history of chronic HCV, was denied the benefit of medical services—i.e., access to DAA medications—by reason of his chronic HCV, which caused a disability.

First, the record clearly establishes that FDC failed to treat HCV-infected inmates with DAAs for nearly four years. FDC has conceded this finding. Further, FDC was not simply providing inadequate care. Rather, FDC categorically denied inmates with chronic HCV access to DAAs—both in practice and by policy— contrary to the prevailing standard of care, which was to provide DAAs to all patients with chronic HCV, regardless of the stage of their liver disease. In fact, as of November 17, 2017, FDC only treated thirteen inmates with DAAs. By then FDC had identified at least 7,000 inmates who had HCV. ECF No 52-1, at 6 n.9; *see also* ECF No. 54-4, at 52-53.

Moreover, by refusing to provide DAAs, a prescription medication, to inmates with chronic HCV, FDC denied them access to and the benefit of medical services,

while not imposing such a restriction on inmates with other disabilities, or with no disabilities at all. For example, FDC does not prioritize treatment for inmates with HIV, and it provides HIV medication without restriction and regardless of disease progression. *See* ECF No. 54-20, at 118-20. If an HIV-infected inmate needed the medication, a doctor would prescribe it. *Id.* at 117-18. FDC did not prescribe DAAs even to those who presented the most advanced stages of cirrhosis. *See* ECF No. 54-21. This amounted to categorical discrimination. *See, e.g.*, *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 994 (11th Cir. 2015) ("[T]he failure of the prison to give the Plaintiff the treatment prescribed by his dermatologist is sufficient for the Plaintiff to plead a prima facie ADA claim."); *Stafford v. Wexford of Ind.*, LLC, No. 1:17-cv-00289-JMS-MJD, 2017 U.S. Dist. LEXIS 166994, at *8 (S.D. Ind. Oct. 10, 2017) ("Plaintiffs do not complain[] about the quality of care administered by Wexford; rather, they assert that Wexford has refused to treat Plaintiffs' disabilities, which is actionable under the ADA."); *Mitchell v. Williams*, No. 6:15-cv-93, 2016 U.S. Dist. LEXIS 20861, at *11 (S.D. Ga. Feb. 22, 2016) ("Plaintiff has plausibly alleged that the Department of Corrections has denied him departmental services, programs, or activities by reason of his having Hepatitis C."); *Payne v. State*, No. CV 09-01195-PHX-NVW, 2012 U.S. Dist. LEXIS 48147, at *11 (D. Ariz. Apr. 5, 2012) ("[A] Plaintiff may have a valid claim under the ADA where he can show that Defendant discriminated against [him] because of his [disability], not by providing

him with inadequate care, but by denying him immediate access to prescribed medications." (citation and quotations omitted)).

The ADA also requires public entities to provide equal access and enjoyment of all services, 28 C.F.R. § 35.130(b)(1), and prohibits public entities from using criteria or methods that have the effect of subjecting individuals with disabilities to discrimination or that defeat or substantially impair accomplishment of the objectives of any program, service, or activity. 28 C.F.R. § 35.130(b)(3).

FDC's HCV-treatment policy was indisputably unconstitutional and fell well below what the standard of care required. The criteria used by FDC for determining whether an inmate qualified for DAAs was so egregious and deficient that only those with the end-stage liver disease would be *considered* for treatment. In other words, if an inmate qualified for treatment under FDC's policy, they were knocking on death's door. Incredibly, Plaintiff qualified for treatment under FDC's unconstitutional policy in 2015. Yet, FDC dragged its feet for nearly three years before treating Plaintiff. This delay was due to the costs of treatment. *See infra.*

The standard of care required that FDC offer him DAAs when it was determined that Plaintiff had chronic HCV, which, as set forth above, caused Plaintiff to have a disability. Plaintiff likely had cirrhosis in 2013, and certainly had it in 2015. DAAs should have been immediately provided to Plaintiff then, but were withheld from him, without any medical justification, until March 2018. FDC cannot

skirt its duty to provided constitutionally-adequate care by creating a policy that ineffectively evaluates the severity and stage of an inmates liver disease, and having a practice of not treating inmates for serious medical conditions solely because the treatment is expensive. Such failures not only violated the standard of care, but also amounted to disability-based discrimination.

### 3. FDC Was Deliberately Indifferent to Plaintiff's Chronic HCV, a Serious Medical Condition and Disability

Moreover, FDC's refusal to treat Plaintiff with DAAs constituted deliberate indifference to Plaintiff's chronic HCV, which was and caused a disability.

To recover monetary damages under the ADA and RA, Plaintiff must show that FDC "violated his rights under the statutes and did so with discriminatory intent." *McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135, 1146-47 (11th Cir. 2014). "A plaintiff may prove discriminatory intent by showing that a defendant was deliberately indifferent to his statutory rights. *Id.* at 1147; *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012) ("[A] plaintiff may demonstrate discriminatory intent through a showing of deliberate indifference.").

"To establish deliberate indifference, a plaintiff must show that the defendant <u>knew</u> that harm to a federally protected right was substantially likely and <u>failed</u> to act on that likelihood." *McCullum*, 768 F.3d at 1147 (quotation marks omitted) (emphasis in original). In other words, Plaintiff must show that FDC had subjective knowledge of a risk of serious harm and that FDC disregarded that risk by conduct

that is more than mere negligence. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326-27 (11th Cir. 2007). In this Circuit, conduct that is more than mere negligence includes:

> (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all.

*Baez v. Rogers*, 522 F. App'x 819, 821 (11th Cir. 2013) (unpublished). *See Johnson v. Bryson*, No. 5:16-cv-453-CAR-MSH, 2017 U.S. Dist. LEXIS 145300, at *3 (M.D. Ga. Sep. 8, 2017) ("[T]he ADA is not wholly inapplicable to claims based on deliberate indifference to an inmate's medical condition.").

FDC's deliberate indifference to Plaintiff's chronic HCV and disability is indisputable. *See, e.g.*, ECF No. 54-1, at 12 (noting that even Dr. Dewsnup, FDC's expert in *Hoffer*, "all but admitted that [FDC] has been deliberately indifferent" to HCV-infected inmates). The record clearly demonstrates FDC's knowledge of the serious risks associated with HCV. In fact, FDC admits that chronic HCV is a serious medical need. *See* ECF No. 54-33, at ¶ 1. Moreover, FDC admits that Plaintiff self-reported his diagnosis with HCV on November 13, 2013. *Id.* at ¶ 8. Two days later, FDC staff confirmed Plaintiff's diagnosis. ECF No. 54-24, at 52. Even assuming FDC was not aware of Plaintiff's diagnosis in 2013, which it was, FDC had actual knowledge of Plaintiff's diagnosis in 2015 when FDC authorized his transfer to Graceville *for treatment. See* ECF No. 54-26.

27

Despite knowing that Plaintiff had chronic HCV and that chronic HCV presents a risk of serious harm (especially in patients with cirrhosis, such as Plaintiff), FDC disregarded that risk by conduct that is indisputably more than mere negligence.[13]—it was intentional based solely on cost, as FDC has conceded. *See* ECF No. 54-2, at 3. Indeed, the *Hoffer* Court found as a matter of fact that "FDC's failure to treat was due to a lack of funding." ECF No. 54-1, at 8; *see also Ancata*, 769 F.2d at 705 ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates."); *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991). Nonetheless, FDC refused to provide care that was clinically-indicated and constitutionally-required.

Further, FDC instituted policies that essentially precluded all but the sickest inmates from obtaining DAAs. *See supra*. Somehow Plaintiff qualified in 2015 but FDC buried its head in the sand until a Court ordered it to start treating inmates in late-2017. During that time period, it is clear "FDC had a policy and practice of not providing adequate screening, evaluation, and treatment of HCV." ECF No. 54-5, at 8. Indeed, FDC knew in 2015 that it was not complying with the national criteria for treatment of HCV, and that HCV puts inmates like Plaintiff at very high of

---

[13] The *Hoffer* Court found that FDC was "deliberately indifferent under nearly every formulation of the standard" as it relates to the plaintiff-class, of which Morrison was a member. ECF No. 54-1, at 7-8; *see also Baez*, 522 F. App'x at 821 (listing several examples of conduct that is more than mere negligence).

developing cirrhosis and liver cancer. Nonetheless, FDC disregarded its obligation to comply with the nationally-recognized standard of care, as well as the very serious risks associated with HCV, **because the cost of DAAs was high**. *See* ECF No. 54-1, at 7-11. This conduct denied Plaintiff DAAs for a non-medical reason. Thus, it is indisputable that FDC was deliberately indifferent to Plaintiff's chronic HCV and disability, which had the effect of excluding Plaintiff from receiving DAAs, in violation of the U.S. Constitution, the ADA and the RA.

### C.   Plaintiff Exhausted His Administrative Remedies

Plaintiff properly exhausted his administrative remedies prior to filing suit. *See* ECF No. 54-31; ECF No. 54-32. Plaintiff thoroughly addressed the exhaustion issue in his Response to Defendants' Joint Motion to Dismiss, ECF No. 39, and therefore incorporates by reference the facts and legal arguments contained therein.

## IV.
## CONCLUSION

For the foregoing reasons, the Plaintiff, Billy Morrison, requests that this Court grant this Motion for Summary Judgment and enter judgment in favor of Plaintiff and against Defendant FDC as to FDC's liability under the ADA and RA.

Respectfully submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA (FBN 1010637)
john@andrewslaw.com

*/s/ Ryan J. Andrews*
RYAN J. ANDREWS (FBN 0104703)
ryan@andrewslaw.com
service@andrewslaw.com
*Attorneys for Plaintiff*

## LOCAL RULE 7.1(F) CERTIFICATE

Pursuant to Rule 7.1(F) of the Local Rules of the Northern District of Florida, the undersigned hereby certifies that the foregoing Motion and Memorandum contains 7,952 words.

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic service on this 8th day of August, 2019, to:

Jeffery R**.** Lawley, Esq.
BILLING, COCHRAN, LYLES,
MAURO & RAMSEY, P.A.
SunTrust Center, 6th Floor
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
jrl@bclmr.com
maryannt@bclmr.com
*Attorneys for Defendants GEO,*
*CCS, Alvarez, and Poythress*

John S. Derr, Esq.
Christopher D. Hastings, Esq.
Quintairos, Prieto, Wood & Boyer P.A.
227 North Bronough Street, Suite 7400
Tallahassee, Florida 32301
jderr.pleadings@qpwblaw.com
christopher.hastings@qpwblaw.com
linda.munroe@qpwblaw.com
*Attorneys for Defendant FDOC*

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA